# United States Court of Appeals
## For the First Circuit

No. 18-1859

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN E. SEARY-COLÓN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Johnny Rivera-González for appellant.
Seth A. Tremble, Special Assistant United States Attorney,
with whom W. Stephen Muldrow, United States Attorney, and
Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

May 4, 2021

**THOMPSON, Circuit Judge**.  Defendant-appellant Juan E. Seary-Colón ("Seary") was charged with Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); murdering a person through the use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(j) (Count Two); possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count Three); and being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Four).  After a three-day trial, the jury convicted him on all counts.  Seary now challenges the district court's denial of his motion to suppress identification evidence, the sufficiency of the evidence supporting his convictions, and the district court's determination that Hobbs Act robbery qualifies as a "crime of violence" under 18 U.S.C. § 924(c), which underpinned his convictions on Counts Two and Three.  Finding no error, we affirm.

## I.  Background

### A.  Factual Background

On April 3, 2012, around 3:20 p.m., two men entered the Piezas Importadas located on Monserrate Avenue in Carolina, Puerto Rico, to commit a robbery.  Piezas Importadas is an auto parts store that sells merchandise obtained from suppliers located in the mainland and abroad.  April 3rd, 2012 was a busy day at the store, and several customers and employees were around at the time

of the robbery.  Five employees, including José Méndez-del Valle ("Méndez") and the store manager David Méndez-Calderón ("Méndez-Calderón"), were working behind the service counter facing the door through which the robbers entered.  As the store owner's wife and store accountant, María Judith Sanabria-Rivera ("Sanabria"), was getting ready to leave for the day and was heading towards the door, the two men burst into the store.  The first man to enter was wearing a cap and a dark hoodie.  He entered the store while brandishing a firearm, announced the robbery, and ordered everyone to "lie on the ground."  Sanabria noticed that the man had "very specific" eyebrows that "were marked going up and then thin coming down; not . . . like . . . regular eyebrows that men usually have."  She also noticed that he had a peculiar tattoo on his left leg, which had light, basic colors, "not like the tattoos that are used nowadays with . . . lot[s] of color[s]."  Before anyone could get down, the gunman walked straight to the service counter, pointed his gun at Méndez-Calderón, and shot him once in the face.  Méndez-Calderón fell to the ground and died shortly thereafter as a result of the gunshot wound.  The gunman started walking from one side of the store to the other while cursing and yelling at everyone not to look at him.  Meanwhile, the other robber jumped over the service counter and asked Méndez for the store's petty cash.  Méndez complied and handed him a metal box with approximately

$1,020.  The robber took the box with the money, pushed Méndez to the floor, and told him to stay on the ground and not look at him. The robber then jumped back over the counter, joined the gunman, and ran out of the store with the gunman.  The robbery lasted approximately forty seconds.  After realizing that the robbers were gone, Sanabria called 9-1-1, reported the robbery and asked for help for Méndez-Calderón.  The store closed to the public after the robbery and remained closed for more than a day.

Law enforcement officers arrived at the scene shortly thereafter.  Agent Calixto Caamaño-De Jesús ("Agent Caamaño") from the Puerto Rico Police was one of the officers who arrived at the scene and was initially in charge of the investigation.  Agent Caamaño was at the time assigned to the Homicide Division of the Center for Criminal Investigations in Carolina.  Two Federal Bureau of Investigation ("FBI") task force agents, Emmanuel Martínez-Martínez ("Agent Martínez") and José Bocanegra-Ortiz ("Agent Bocanegra"), also arrived at the scene.  Law enforcement recovered from the scene a projectile jacket, a fired projectile, and a Federal Smith & Wesson .40-caliber shell casing.  They also interviewed Méndez and Sanabria that same day.

The next day, April 4, Agent Caamaño showed Méndez a nine-photo array that included Seary's photo, along with eight fillers.  The array included photos of male subjects of roughly

the same ages and eye color. All subjects also had the same hair color, and eight of the nine subjects, including Seary, had relatively short hair. At least six of the subjects, including Seary, seemed to have manicured eyebrows. Agent Caamaño warned Méndez regarding the procedure for the array and instructed him that "if he sees" the photo of the person who had shot Méndez-Calderón the day before, he should let Agent Caamaño know. Méndez picked Seary's photo, which occupied the fourth position in the array, as that of the man who had shot Méndez-Calderón during the Piezas Importadas robbery.

On April 6, 2012, local law enforcement agents arrested Seary at a two-level house located in Villa Fontana, Carolina, that was shared by some of Seary's relatives. The agents found Seary hiding inside a cut-out box spring that was under a mattress in a bedroom located on the first floor of the house. His arrest, however, was unrelated to the Piezas Importadas robbery and Méndez-Calderón's murder. Instead, Seary's arrest was related to a local criminal case in which he was a fugitive. Seary's arrest was featured on the cover of Primera Hora, a local newspaper, on April 9, 2012. Two days later, Agent Caamaño called Méndez and asked him if he had seen the April 9 Primera Hora newspaper. Méndez responded that he had not but that he would get a copy of the newspaper. Agent Caamaño instructed him to call him if he saw

anything that caught his attention in the newspaper. Later that day, Méndez obtained a copy of the newspaper and called Agent Caamaño. Méndez told him that the man featured in the newspaper cover was the same man that had killed Méndez-Calderón, that he had the "same" face, and that the man was wearing the same dark hoodie that the gunman had worn on the day of the robbery. That same day, Agent Caamaño went to Piezas Importadas to have Méndez date and sign the Primera Hora newspaper cover. During that interaction, Méndez repeated that the man portrayed in the newspaper cover had killed Méndez-Calderón and stated that "he had the same deep look [in the picture] that he had when he had come into the business and had killed David [Méndez-Calderón]."

Following Seary's arrest, the FBI officially took over the case, and Agent Bocanegra became the case agent. Agents Bocanegra and Martínez interviewed Sanabria at her house on April 11, 2012. Sanabria described the gunman to the agents and mentioned the peculiar tattoo that he had on his left leg.[1] On April 17, 2012, Agents Bocanegra and Martínez returned to Sanabria's house to show her a six-photo array. The array included Seary's photo as well as those of five of the fillers from the

_____

[1] At the time of the trial, in 2018, Agent Martínez did not remember if Sanabria had mentioned the gunman's tattoo during her interview with him and Agent Bocanegra, though Sanabria testified that she had mentioned it at some point.

April 4 array, though the positioning of the photos was altered.[2] Hence, the photos included in the April 17 array shared the same similarities as those in the April 4 array. Agent Martínez advised Sanabria that the array "may or may not contain a picture of the person who committed the crime" at Piezas Importadas. Sanabria looked at the photo array and "quickly" picked Seary's photo.

In mid-April, several FBI task force agents executed a search warrant in the Villa Fontana house where Seary had been arrested the week before. During the search, one of the officers seized a Federal Smith & Wesson .40-caliber bullet inside a pot located on the second floor of the house.

## B.  Procedural Background

Based on the April 3, 2012 incident, a federal grand jury returned an indictment on April 19, 2012, charging Seary with Counts One through Four.

Seary moved to suppress Méndez's and Sanabria's out-of-court identifications and to prevent them from identifying him in court. He argued that it was "highly questionable how [Seary's photo] made it into the array" in the first place, that Méndez's description of Seary "lack[ed] reliability," and that the circumstances surrounding Sanabria's identification "raise[d]

_____

[2]  In the April 4 photo array, Seary's photo occupied position number four out of nine whereas in the April 17 photo array Seary's photo occupied position number five out of six.

questions as to its reliability." He also complained that the April 17 array had only six photos, that the agents conducted a photo array instead of a line-up, and that the procedures used for conducting the photo array did not "fully compl[y]" with the "best practices" stated in a U.S. Department of Justice memorandum dated January 6, 2017.

The government opposed the motion, arguing that the photo arrays used in this case were not unduly suggestive. After reviewing the photo arrays, the district court agreed with the government. Accordingly, it denied Seary's motion to suppress.

Seary's jury trial began on February 20, 2018. The government introduced Méndez's and Sanabria's out-of-court identifications as exhibits at trial, as well as the testimony of twelve witnesses, including both Méndez and Sanabria. Méndez testified that he was standing next to Méndez-Calderón and approximately three feet across from Seary when he saw Seary shoot Méndez-Calderón. According to Méndez, he looked at Seary's face for two or three seconds and he "couldn't forget that face because [Seary] had a look that was cold, as if he didn't care anything about life." Méndez admitted that he had been mistaken when on April 11, 2012, he told Agent Caamaño that the man featured in the newspaper cover had the same dark hoodie that the gunman had been wearing during the Piezas Importadas robbery, and attributed the

mistake to the fact that he was focused on Seary's face and firearm, not on his clothing, and to both pieces of clothing being similar. For her part, Sanabria testified that she looked at Seary for two seconds, including the exact moment when he shot Méndez-Calderón,[3] and that Seary's manicured eyebrows and unusual tattoo on his left leg caught her attention. Sanabria also identified Seary in court as Méndez-Calderón's shooter.

After all of the government's identification evidence had been presented, Seary moved the district court to reconsider its denial of his motion to suppress. Seary argued that Méndez's identification was not reliable because Méndez had seen the gunman's face for only two or three seconds and had admitted to being wrong about the gunman's clothing. Seary contended that Sanabria's identification should also be suppressed as unreliable because she too only saw the gunman's face for approximately three seconds, the FBI conducted a photo array instead of a line-up, her photo array contained only six photos, and there were inconsistencies between her testimony and that of Agent Martínez as to whether Sanabria had previously mentioned seeing a tattoo on the gunman's left leg. The district court denied Seary's motion

---

[3] The government introduced into evidence a still image of Sanabria looking at the gunman pointing a firearm at Méndez-Calderón.

for reconsideration on the same grounds that it had denied his original motion to suppress and clarified that the court's ruling "d[id] not preclude [Seary] from arguing to the jury that the government has not met its burden of proof as to the fact that [he] was indeed the person who committed the crime."

At the close of the government's case, Seary moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, which the district court denied. Seary then presented one witness in his defense: his stepfather, Santiago Muñiz-Cruz ("Muñiz"). Muñiz testified that he lived on the second floor of the Villa Fontana house where Seary had been arrested, and that the Federal Smith & Wesson .40-caliber bullet seized from inside a pot in mid-April 2012 belonged to him. According to Muñiz, he practiced Santeria, and in 2006 or 2007 he found that bullet on the street and brought it home to use in his Santeria rites.

After presenting his witness, Seary renewed his motion for a judgment of acquittal, which the court again denied. On February 26, 2018, the jury found Seary guilty of all counts. Seary renewed his motion for acquittal, which the court denied for a third time.

On August 20, 2018, the district court sentenced Seary to imprisonment terms of 240 months for Count One, life for Count

Two, 120 months as to Count Three, which the court merged with Count Two after finding that Count Three was a lesser-included offense of Count Two, and 120 months for Count Four. Seary timely appealed.

## II.  Discussion

**A.  The Motion to Suppress**

Seary challenges the district court's denial of his motion to suppress Méndez's and Sanabria's out-of-court identifications of him in the photo arrays and to prevent them from identifying him in court. He generally contends that the photo arrays constructed by the police were in violation of the Due Process Clause. See Neil v. Biggers, 409 U.S. 188, 196-98 (1972).

Identification evidence -- both out-of-court and in-court identifications -- "should be suppressed as a matter of due process 'only in extraordinary cases.'" United States v. Holliday, 457 F.3d 121, 125 (1st Cir. 2006) (quoting United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003)). To withhold identification evidence from a jury, the defendant must persuade the court that the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Biggers, 409 U.S. at 197 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)); see also

United States v. Casey, 825 F.3d 1, 17 (1st Cir. 2016) (noting that "[t]he defendant bears the burden to establish [that] an out-of-court identification was infirm"). The defendant must first establish that the identification procedure was unduly suggestive. Perry v. New Hampshire, 565 U.S. 228, 241-42 (2012). "If it was not, the inquiry ends," United States v. Melvin, 730 F.3d 29, 34 (1st Cir. 2013), and it is for the jury to determine how much weight to afford the identification evidence, Casey, 825 F.3d at 17. If, however, the defendant can successfully establish that the identification procedure was unduly suggestive, we must "then examine the totality of the circumstances to ascertain whether the identification was nevertheless reliable."[4] Melvin, 730 F.3d at

---

[4] In Biggers, the Supreme Court set forth the following factors for evaluating the reliability of identifications:

> [(1)] the opportunity of the witness to view the criminal at the time of the crime, [(2)] the witness' degree of attention, [(3)] the accuracy of the witness' prior description of the criminal, [(4)] the level of certainty demonstrated by the witness at the confrontation, and [(5)] the length of time between the crime and the confrontation.

409 U.S. at 199-200. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." Manson v. Brathwaite, 432 U.S. 98, 114 (1977). Absent a finding of a "substantial likelihood of irreparable misidentification," "such evidence is for the jury to weigh," as "some element of untrustworthiness is customary grist for the jury mill" because "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Id. at 116.

34 (citing United States v. DeCologero, 530 F.3d 36, 62 (1st Cir. 2008)). "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." Perry, 565 U.S. at 232. The same analysis applies to both pretrial and in-court identifications. See Holliday, 457 F.3d at 125 (noting that the two steps outlined above apply "[b]oth as to pretrial identifications and in-court identifications"); id. ("When the conviction is 'based on eyewitness identification at trial following a pretrial identification by photograph,' we will reverse on a constitutional basis only if the 'very substantial likelihood of misidentification' was 'irreparable,' despite the defendant's opportunity to cross-examine the witness about the accuracy of the identification." (quoting Simmons, 390 U.S. at 384)).

We review de novo the district court's denial of a motion to suppress a photo identification. Id. Seary asserts two grounds as to why Méndez's identification of him in the April 4 photo array should have been suppressed. First, he contends that Méndez's identification should have been suppressed because "[i]t is highly questionable" and "suspicious" how Seary made it into the array in the first place. This, however, is not enough to

-13-

suppress Méndez's identification of Seary.  The record shows that Seary was the only suspect included in the arrays -- the rest were fillers -- and there is no evidence in the record suggesting that he was improperly included as a suspect.  Although Seary complains that the record is silent as to why he was included in the photo arrays, he had the burden of establishing improper police conduct and developing the record below in this respect.  See Casey, 825 F.3d at 17; see also Moore v. Dickhaut, 842 F.3d 97, 101 (1st Cir. 2016).  Second, Seary argues that the gunman's description that Méndez provided "lacks reliability," which may lead to a mistaken identification.  The fatal flaw with Seary's argument, however, is that it centers on the reliability of Méndez's identification. We do not, however, reach the reliability issue unless the defendant first establishes that the identification procedure was unduly suggestive.  See Moore, 842 F.3d at 101 (stating that "the issue of reliability 'comes into play only after the defendant establishes improper police conduct'" (quoting Perry, 565 U.S. at 241)).  And here, Seary does not claim, let alone establish, that the April 4 photo array was unduly suggestive.  "Absent unnecessarily suggestive procedures, reliability is ensured through traditional trial protections, such as '. . . vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification

-14-

and the requirement that guilt be proved beyond a reasonable doubt,'" id. (quoting Perry, 565 U.S. at 233), which Seary received in this case.

Next, Seary argues that Sanabria's identification of him in the April 17 photo array should have been suppressed because: (1) the array contained only six photos and not nine, as the April 4 photo array; (2) the procedures used for conducting the photo array did not "fully compl[y]" with "best practices" stated in a U.S. Department of Justice memorandum dated January 6, 2017; (3) "it would have been the best investigative course of action to conduct a line-up" where defense counsel could have participated, instead of a photo array; (4) Seary's photo had been featured in the Primera Hora newspaper cover and Sanabria was allegedly aware that Seary had been arrested at the time of her identification; and (5) Sanabria allegedly failed to mention Seary's leg tattoo before trial.

Seary's first two arguments relate to the procedure selected by law enforcement to conduct the April 17 photo array. These arguments, however, lack merit because Seary has failed to establish that the procedure followed in this case made the photo array unduly suggestive. Furthermore, although Seary complains that the April 4 array had nine photographs, whereas the April 17 array had only six, the evidence shows that the number of photos

varied because each photo array identification was conducted by a different law enforcement agency following its own standard procedures. The first array was conducted by Agent Caamaño, a local law enforcement officer, who testified that in conducting the array he followed the Puerto Rico Police's "Norms that Govern the Photographic Identification Procedure," which establish that "the witness will be shown no less than nine photographs including the one of the suspect with similar traits to the suspect." The April 17 array, however, was conducted by FBI task force agents after the case had been transferred to the federal jurisdiction and followed FBI's "custom[s] at th[e] time." In addition, although Seary argues that the FBI did "not fully compl[y] with" all of the "best practices" for conducting photo arrays stated in a January 6, 2017 U.S. Department of Justice memorandum, he acknowledges that said memorandum was issued almost five years after the April 17 photo array was conducted.[5] Moreover, that memorandum clearly states that the procedures outlined therein "are not a step-by-step description of how to conduct photo arrays, but rather set out principles and describe examples of how to perform them." Sally Yates, U.S. Dep't of Just., Eyewitness

---

[5] In any event, we note that the memorandum establishes that a photo array should include only one suspect and at least five filler photographs, which the April 17 photo array clearly complied with. See Sally Yates, U.S. Dep't of Just., Eyewitness Identification: Procedures for Conducting Photo Arrays 3 (2017).

<u>Identification: Procedures for Conducting Photo Arrays</u> 2 (2017).

It further clarifies that "nothing in th[at] memorandum implies

that an identification not done in accordance with th[ose]

procedures is unreliable or inadmissible in court."  <u>Id.</u>

Seary's third argument fares no better.  Although he

might have preferred that the FBI conduct a line-up in the presence

of defense counsel instead of a photo array identification, he has

failed to show any illegality behind the FBI's decision to conduct

a photo array.  In fact, Agent Martínez testified that the FBI's

usual practice is to conduct photo arrays instead of line-ups,

that during his approximately seven years working with the FBI he

had conducted over forty photo arrays and not a single line-up,

and that the fact that defense counsel might have been present

during a line-up had no bearing on the FBI's decision to conduct

a photo array in this case.[6]

---

[6]  We note that Seary had not yet been indicted when the
FBI conducted the April 17 photo array.  Thus, the constitutional
right to counsel would not have attached if a line-up had been
conducted at that time.  <u>See</u> <u>Gullick</u> v. <u>Perrin</u>, 669 F.2d 1, 3 n.5
(1st Cir. 1981) ("At the time of the lineup, the petitioner had
not yet been indicted and, thus, his right to counsel at the lineup
had not yet attached." (citing <u>Kirby</u> v. <u>Illinois</u>, 406 U.S. 682,
690 (1972))); <u>but</u> <u>cf.</u> <u>Roberts</u> v. <u>Maine</u>, 48 F.3d 1287, 1291 (1st
Cir. 1995) (considering the possibility that an exception to that
rule might apply in "extremely limited" circumstances not present
in this case).

Seary's next contention also fails. Although Seary's photo had been featured in the newspaper cover eight days before Sanabria identified him in the April 17 photo array, there is no evidence that law enforcement showed Sanabria Seary's photo in the newspaper or directed her to that photo, or that she had even seen it.[7] Accordingly, any potential suggestiveness stemming from Sanabria having seen the newspaper cover is not subject to suppression under the two-step analysis. See Perry, 565 U.S. at 243-44, 248 (noting that a witness's out-of-court identification of a "defendant to police officers after seeing a photograph of the defendant in the press captioned 'theft suspect,'" might be affected by "[e]xternal suggestion," but holding that the two-step "due process check" does not apply "when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement"). Furthermore, the newspaper article was unrelated to the Piezas Importadas robbery, and Sanabria was informed that the array "may or may not contain a picture of the person who committed the [robbery]." Nor is there any evidence that Méndez's prior identification of Seary influenced Sanabria's identification. Sanabria denied having learned of Seary's arrest from Méndez, who in turn denied having told anyone that he had

_____

[7] There is no evidence that Sanabria was aware that Seary had been arrested at the time that she identified him in the photo array.

-18-

identified Seary in the April 4 array.  There is simply nothing in the record to conclude that Sanabria's identification procedure was unduly suggestive or otherwise tainted by either the photo on the newspaper cover or Méndez's prior identification.

Seary's last contention -- that Sanabria allegedly failed to mention his leg tattoo before trial -- relates to the reliability of Sanabria's identification, and not to the suggestiveness of the identification procedure.  Yet, as discussed above, when, as here, a defendant fails to establish that the identification procedure was unduly suggestive, we do not reach the reliability issue.  See Moore, 842 F.3d at 101; Perry, 565 U.S. at 241.  Instead, "reliability is ensured through traditional trial protections," and it is up to the jury to determine how much weight to afford to the identification evidence.  Moore, 842 F.3d at 101 (citing Perry, 565 U.S. at 233).

Finally, Seary also contests Sanabria's in-court identification, arguing that it was "tainted by [her] earlier [improper pretrial] identification and therefore it must also be excluded."  Because the success of Seary's challenge to Sanabria's in-court identification is contingent on the success of his arguments contesting her pretrial identification, which we have already rejected, his challenge to the in-court identification likewise fails.

-19-

In sum, identification evidence should be withheld from a jury "only in extraordinary cases." Melvin, 730 F.3d at 34 (quoting United States v. Rivera-Rivera, 555 F.3d 277, 282 (1st Cir. 2009)). Seary has failed to show that the district court erred in denying his motion to suppress the identification evidence here.

**B. Sufficiency of the Evidence**

Seary's sufficiency-of-the evidence challenge on appeal is quite limited. Seary concedes that an armed robbery took place at Piezas Importadas on April 3, 2012, during which Méndez-Calderón was murdered, but he claims that the evidence is insufficient to link him to the armed robbery and murder.

Because Seary preserved his challenge to the sufficiency of the evidence, we review de novo the district court's denial of his motion for a judgment of acquittal. United States v. Trinidad-Acosta, 773 F.3d 298, 310 (1st Cir. 2014), superseded in part on other grounds, U.S.S.G. App. C Supp., Amend. 794, as recognized in United States v. De la Cruz-Gutiérrez, 881 F.3d 221, 225 (1st Cir. 2018). In so doing, we determine whether "any reasonable jury could find all the elements of the crime [proven] beyond a reasonable doubt." United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015) (quoting United States v. Azubike, 564 F.3d 59, 64 (1st Cir. 2009)). We need not conclude that "no verdict other

-20-

than a guilty verdict could sensibly be reached, but must only [be] satisf[ied] . . . that the guilty verdict finds support in a plausible rendition of the record."  United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (internal quotation marks omitted).

In determining whether the record provides such support, we do not view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls.  Santos-Soto, 799 F.3d at 57; United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013).  Instead, we evaluate the sum of all the evidence and inferences drawn therefrom in the light most favorable to the government, resolve all credibility disputes in its favor, and "determine whether that sum is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not enough when viewed in isolation."  Santos-Soto, 799 F.3d at 57; see also United States v. Gaw, 817 F.3d 1, 3-4 (1st Cir. 2016).  We will only reverse on a sufficiency challenge if, "after viewing the evidence and reasonable inferences in the light most flattering to the prosecution, [we conclude that] no rational jury could have found him guilty beyond a reasonable doubt."  Acosta-Colón, 741 F.3d at 191.

Here, the government presented several pieces of evidence to prove that Seary was the armed robber who murdered

Méndez-Calderón.   During the government's case in chief, Méndez testified that he was behind the service counter facing the door through which Seary and his accomplice entered the store in the afternoon of April 3, 2012.   Méndez further testified that he looked at Seary for two or three seconds as Seary entered the store while brandishing a firearm, walked towards Méndez-Calderón, pointed his firearm at Méndez-Calderón, and shot him.   Méndez explained that this occurred while he was standing next to Méndez-Calderón, approximately three feet away from Seary, that his attention was focused on Seary's face and firearm, and that he could not forget the facial expression that Seary had as these tragic events unfolded.   Méndez further testified that he identified Seary in the nine-photo array presented to him on the day following the robbery and again in a picture featured in the cover of the Primera Hora newspaper published on April 9, 2012.[8] Agent Caamaño also testified as to both of Méndez's out-of-court identifications of Seary.   In addition, the government presented Sanabria's testimony.   Sanabria's testimony corroborated Méndez's account of how Seary entered the store with a firearm at hand and murdered Méndez-Calderón.   She testified that she looked at Seary for approximately two seconds, noticed his "very specific"

---

[8] We note that the cover of the April 9 Primera Hora newspaper was introduced at trial without objection, and Seary does not challenge that evidence on appeal.

eyebrows and the peculiar tattoo on his left leg, and saw the exact moment when Seary shot Méndez-Calderón. Sanabria identified Seary as the robber who murdered Méndez-Calderón both in the six-photo array conducted on April 17, 2012, and in court. FBI task force Agent Martínez also testified as to Sanabria's out-of-court identification of Seary and how "quickly" she had picked Seary's photo from the array conducted on April 17, 2012. Additional evidence, including two surveillance videos and still images from those videos, corroborated Méndez's and Sanabria's accounts. In addition, other government witnesses testified to having recovered a projectile jacket, a fired projectile, and a Federal Smith & Wesson .40-caliber shell casing from the scene, and having later found a matching Federal Smith & Wesson .40-caliber bullet during the execution of a search warrant at the Villa Fontana house where Seary was arrested.

Seary argues that this evidence is insufficient because only two eyewitnesses identified him in photo arrays despite there being several other employees and customers at the store when the robbery occurred, and only one of them also identified him in court. Seary's argument is a non-starter as we have repeatedly held that "[t]estimony from even just 'one witness can support a conviction.'" United States v. Alejandro-Montañez, 778 F.3d 352, 357 (1st Cir. 2015) (quoting United States v. De La Paz-Rentas,

613 F.3d 18, 25 (1st Cir. 2010)); Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009) (noting that "a criminal conviction can rest on the testimony of a single eyewitness" and "[e]ven if the eyewitness's testimony is uncorroborated and comes from an individual of dubious veracity, it can suffice to ground a conviction"). Furthermore, "[t]here is no requirement . . . that a witness who makes an extrajudicial identification must repeat the identification in the courtroom." Foxworth, 570 F.3d at 427.

Seary also argues that the evidence supporting his convictions is insufficient because the identifications made by Méndez and Sanabria are unreliable and their testimony was untrustworthy. Specifically, Seary argues that Méndez and Sanabria "did not have much time to view the [gunman]," and that they must have been in a state of "panic, stress[,] and anxiety" during the robbery, which casts doubts about the accuracy of their recollections. Seary also contends that it strains credulity that Méndez "allegedly saw [him] but cannot state what [he] was saying [during the robbery]" or that Méndez did not speak with Sanabria about his identification of Seary as the gunman. In addition, he notes that there were some inconsistencies between Sanabria's and Agent Martínez's testimony regarding whether Sanabria had previously mentioned to law enforcement that the gunman had a tattoo on his left leg, which makes Sanabria's testimony "highly

suspicious." Seary further notes that Sanabria testified to having heard two gunshots, yet, because law enforcement recovered only one shell casing at the scene, there was no evidence corroborating Sanabria's version.

In making these arguments, Seary tries to call into question the credibility of the witnesses' testimony and the reliability of their out-of-court identification of him. Yet, in assessing the sufficiency of the evidence supporting a defendant's conviction, we do not re-weigh the evidence or second-guess the jury's credibility determinations. Santos-Soto, 799 F.3d at 57, 61. Defense counsel vigorously cross-examined the witnesses and tried to undermine their credibility by highlighting these inaccuracies and inconsistencies, but the witnesses' testimony "was neither inherently improbable nor materially undermined by any other unimpeachable proof." Foxworth, 570 F.3d at 426. The jurors were free to credit the witnesses' testimony, and we cannot disturb their decision. See Santos-Soto, 799 F.3d at 57.

Seary next argues that Méndez's identification of him in the nine-photo array "may have been compromised [by] the newspaper['s] . . . front page photograph of [Seary]," and that the "reliability and trustworthiness" of Sanabria's out-of-court identification of him may have also been "affect[ed]" because the array shown to her had fewer photos than the one shown to Méndez.

Seary's argument regarding Méndez's identification is based on an incorrect premise. The evidence shows that Méndez first identified Seary in the nine-photo array on April 4, 2012, one day after the robbery, and that Seary's photo was featured on the newspaper cover five days later, on April 9, 2012. Hence, Méndez's prior identification of Seary in the nine-photo array could not have been influenced by something that had not yet occurred. The evidence also shows that while Méndez's photo array was conducted by local law enforcement officers pursuant to local standard procedures, Sanabria's photo array was conducted by the FBI pursuant to FBI standard procedures. In any event, the reliability of the identification of Seary in the photo arrays was a matter to be determined by the jury after defense counsel argued the point vociferously to the jury. We cannot re-weigh the evidence presented to the jury or second-guess the jury's credibility determinations. Id.

Finally, Seary protests that law enforcement did not test the clothes he was wearing when he was arrested for DNA, analyze "blood spatter or gun powder residue," "conduct any ballistic test or examination," lift any fingerprints from the scene, or enhance the surveillance footage for a better image of the robbers. Nor did law enforcement recover physical evidence linking him to the crime scene, such as the clothes he was wearing

during the robbery or the metal box and money taken from Piezas Importadas. Although Seary acknowledges that the Federal Smith & Wesson .40-caliber bullet that was seized from his house matched the Federal Smith & Wesson .40-caliber shell casing recovered at the crime scene, he attempts to undermine the significance of this evidence by arguing that this is "a very common ammunition" and that his stepfather testified at trial that the bullet belonged to him, not to Seary.

We decline Seary's invitation to overturn his convictions because the government did not procure additional testing. When assessing the sufficiency of the evidence supporting a conviction, we look only at the evidence presented at trial. See Trinidad-Acosta, 773 F.3d at 310-11. We do "'not consider the potential magnitude of the evidence not presented,' because doing so would be 'an invitation to examine whether the Government might have presented a more convincing case, not whether it in fact presented a sufficient one.'" Santos-Soto, 799 F.3d at 62 (quoting United States v. García, 758 F.3d 714, 721–22 (6th Cir. 2014)). Lastly, we note that, although Seary's stepfather testified at trial that the bullet recovered during the execution of a search warrant was not Seary's but his, "[t]he actual resolution of the conflicting evidence, the credibility of witnesses, and the plausibility of competing explanations is

exactly the task to be performed by a rational jury." Foxworth, 570 F.3d at 427 (quoting Matthews v. Abramajtys, 319 F.3d 780, 790 (6th Cir. 2003)); Acosta-Colón, 741 F.3d at 191 (noting that in assessing the sufficiency of the evidence, we must choose the inference "most compatible with the jury's guilty verdict" when confronted with competing inferences). Moreover, we do not need to be convinced "that the government succeeded in eliminating every possible theory consistent with the defendant's innocence." Trinidad-Acosta, 773 F.3d at 311 (quoting United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009)).

Here, we conclude that the sum of all the evidence presented by the government and the inferences drawn therefrom was sufficient for a rational jury to conclude beyond a reasonable doubt that Seary was the armed robber who murdered Méndez-Calderón on April 3, 2012. See Santos-Soto, 799 F.3d at 62 (noting that a sufficiency-of-the-evidence challenge will fail if the defendant's conviction "rests on sufficient evidence," even if the jury's finding of guilt is not "inevitable based on the evidence").

## C. "Crime of Violence"

Seary argues that Hobbs Act robbery is not categorically a crime of violence for purposes of 18 U.S.C. § 924(c) and thus cannot constitute a predicate offense for his possession of a firearm or murder convictions under sections 924(c)(1)(A)(iii) and

924(j), respectively. Because, in his view, Hobbs Act robbery could only constitute a crime of violence under the residual clause invalidated by the Supreme Court in United States v. Davis, 139 S. Ct. 2319, 2336 (2019), Davis compels the conclusion that his sections 924(c)(1)(A)(iii) and 924(j) convictions are unconstitutional.

We have previously rejected Seary's argument. We held in United States v. García-Ortiz, that "because the offense of Hobbs Act robbery has as an element the use or threatened use of physical force capable of causing injury to a person or property, a conviction for Hobbs Act robbery categorically constitutes a 'crime of violence' under section 924(c)'s force clause." 904 F.3d 102, 109 (1st Cir. 2018). We therefore affirm Seary's convictions on Counts Two and Three.

### III. **Conclusion**

For the foregoing reasons, we affirm Seary's convictions on all counts.

**Affirmed**.