# United States Court of Appeals
## For the First Circuit

No. 24-1356

UNITED STATES OF AMERICA,

Appellee,

v.

STEPHEN PILSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Thompson, Circuit Judges.

    Emmett E. Robinson, with whom Robinson Law Firm LLC was on brief, for appellant.
    Linday B. Feinberg, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.

June 1, 2026

**THOMPSON, <u>Circuit Judge</u>**.  This appeal arises out of a series of lamentable events -- dire ones that led to Stephen Pilson's federal convictions for kidnapping his then-girlfriend, Rilka Stefanov, and for an interstate violation of a protective order.  Those events began in October 2019 and continued through December 2019 -- some three days after Pilson's release from a Massachusetts jail following his conviction for similar offenses in the Commonwealth (against the same victim).

Pilson now raises a few claims of error to the goings-on below, one alleging insufficient evidence to sustain the 18 U.S.C. § 1201(a)(1) federal kidnapping conviction, another asserting jury instructional error premised on the district court's purported misunderstanding of the scope of 18 U.S.C. § 2262(a)(1)'s protections as it applies to state issued domestic violence "stay-away" orders.  Pilson also challenges the district court's application of a sentencing enhancement for obstruction of justice, U.S.S.G. § 3C1.1, which is (as you will see below) essentially a challenge aimed at the procedural reasonableness of that enhancement.  For the reasons we discuss below, we affirm.

## I. Background

We provide most of the basic facts here in the light most flattering to the verdict, "reserving additional details for our discussion of the specific issues raised in this appeal."  <u>See,</u>

e.g., <u>United States</u> v. <u>Ayala-Vazquez</u>, 751 F.3d 1, 7 (1st Cir. 2014).

### a. Pilson's Massachusetts Conviction

Pilson first crossed paths with Stefanov in 2018 at a rehab center known as "Dexter House," where he was admitted following injuries he suffered in a traffic accident. Stefanov was the center's director of social services and, while there, she and Pilson developed a close relationship. After spending nearly three months at Dexter House, Pilson left and, shortly thereafter, moved in with Stefanov.[1]

Pilson and Stefanov continued their relationship, but the good times quickly turned bad. So bad, in fact, that on October 15, 2019, a calamitous domestic violence episode ensued: after kicking, striking, and forcing Stefanov into a vehicle, Pilson held her captive while driving erratically from New Hampshire into Massachusetts. Throughout the ordeal, Pilson repeatedly yelled threats at her, such as: "You are going to die, bitch. You deserve it. You put me in jail for three months, and now you think you can leave me . . . You're going to die today." Stefanov was in tears and pleading with him to stop the car, but instead (that is, instead of adhering to her pleas), Pilson slowed the vehicle to turn around, and she was "able to free herself from

---

[1] Stefanov's employment with Dexter House ended in November of 2018.

the vehicle [and thereafter, she] began yelling for help and for someone to call the police." After screaming to her, "[y]ou'll be sorry, bitch," Pilson fled the scene, but, after the police gathered more details from Stefanov, he was apprehended and jailed.

Eventually, Pilson pleaded guilty in a Massachusetts court to multiple charges, including kidnapping, witness intimidation, assault and battery on a household member, and more. At his consolidated change of plea and sentencing hearing, the Commonwealth's prosecutor asked the judge to impose a "stay-away, no contact" provision ("No Contact Order") against Pilson to prevent him from interacting with Stefanov upon his release. While acknowledging that Stefanov did not join in the Commonwealth's request, the prosecutor pressed for the No Contact Order based on the history of physical abuse between the couple and the extremely volatile nature of their relationship.[2] Troubled by the thought of Pilson's incarceration, Stefanov chose to testify on his behalf, proclaiming that she felt safe around him and that she did not want him to be prohibited from communicating with her. Pilson's attorney also asked the court to refrain from imposing the No

---

[2] The Commonwealth's prosecutor also explained during its summation of the case that Stefanov "told police . . . there had been a past incident in January in Woburn, Massachusetts[,] where [Pilson] had been charged with strangulation threats and domestic [violence offenses]," resulting in a "three month[]" period in jail. Pilson did not protest those allegations.

Contact Order, stating that "they clearly want to be together," and "[s]he clearly feels safe with him."

After accepting Pilson's guilty plea and meting out a fifty-six-day, time-served prison sentence (along with two years' probation), the court sided with the Commonwealth and granted the request for the No Contact Order. In imposing that Order, the court succinctly reasoned that it had "some concerns that [Stefanov] really could have been killed that day [of the October kidnapping]," and after considering the couple's history of violence, that "[i]t doesn't sound like them being together is a good thing."

### b. The December Incident

And then, déjà vu.

On December 13, 2019, one day after Pilson's sentencing hearing, and notwithstanding the No Contact Order, Stefanov went to retrieve Pilson from jail. That night and through the next morning, the two stayed holed up in a hotel room with no reported incidents.

Fast forward two days later to December 15 where Pilson and Stefanov could be found in Stefanov's car, parked near the Beverly, Massachusetts beach with Pilson behind the wheel and Stefanov voluntarily situated in the front passenger seat. After some (unimportant) chit-chat, Pilson began to drive away. They were headed to Canada, he said, and going for the ride of their

lives.  Moments later, he started belting down a large bottle of Grey Goose Vodka and spewing a stream of threatening comments towards Stefanov.  Pilson told Stefanov that she wouldn't "need [her seatbelt] because today is the day that [she] will be dying." He said that he planned to bury her in Canada and that she wouldn't be able to see her kids.  Stefanov began to sob and pleaded with Pilson, but her actions seemed only to fuel his anger.  He called her a "bitch" and told her she was "going to get what [she] deserve[s]."  Stefanov described Pilson's driving that day as erratic and very fast, reaching speeds of 110 miles per hour.  In her telling, Pilson was in a trance-like state, appearing both intoxicated and enraged.  Desperate to flee, Stefanov made multiple attempts to open her car door, aiming to signal other drivers for help.  At one point, Pilson demanded that Stefanov hand over her phone, but she refused.  Pilson then began striking her, bloodying and bruising her face with his attacks, and her phone ended up on the floor by her feet.

Amidst this scuffle, Pilson attempted to tie Stefanov's wrists to the gear shift of the vehicle using her scarf.[3]  Whether

_____

[3] At trial, Stefanov testified that Pilson made the bondage attempt while simultaneously driving the vehicle.  On cross-examination, Pilson's counsel attempted to conflate Stefanov's testimony with her prior statements in a police report where she said Pilson "reduced speed and stopped the car, trying to tie [her] with [her] yellow scarf."  As we'll discuss later on, a jury later sorted out this and all other factual discrepancies.

or not Pilson was successful is unclear, but his attack did not halt Stefanov's attempts to flee. She tried to stop the car by removing the key from the ignition, but she inadvertently broke the fob, and the vehicle motored on.

Distracted by the fob's breakage and in an effort to regain his bearings, Pilson eventually pulled into the breakdown lane in Arundel, Maine, and stopped the car. At that point Stefanov was finally able to escape. After jumping out, Stefanov said she "started running the opposite direction [from] where the car was going," and she didn't "know how long exactly [she] ran for [her] life." A foot chase ensued, but it thankfully ended when Stefanov encountered Maine state troopers. Pilson then switched paths making a beeline "toward the forest" to facilitate his own escape. He was eventually caught and (once again) arrested for kidnapping and domestic offense charges.

## II. Procedural History

A federal grand jury ultimately returned a two-count superseding indictment against Pilson for his actions on December 15, 2019. One count for kidnapping, in violation of 18 U.S.C. § 1201(a)(1) ("Section 1201"), and the second for committing an interstate violation of a protective order, in violation of 18 U.S.C. § 2262(a)(1) ("Section 2262"). Pilson opted to let a jury decide his fate.

During his trial, at the end of the government's case-in-chief, Pilson moved for a judgment of acquittal on both counts. See Fed. R. Crim. P. 29(c). His challenge to the kidnapping offense centered on two theories. The primary argument focused on the first half of the statutory element, specifically that the government failed to meet its evidentiary burden in proving Pilson "knowingly transported [Stefanov] across state lines."[4] Alternatively, Pilson asserted that even if interstate transportation had occurred, the government failed to prove he held Stefanov against her will "during her transportation from Massachusetts through to Maine."

On the second charge involving the protection order violation, Pilson argued for acquittal based on the government's purported failure to prove the No Contact Order (from his October 2019 Massachusetts case) was a "protection order" as a matter of law because, at the time the Massachusetts court imposed it, Stefanov stood in opposition to the Order; thus, it was not made on behalf of "a person seeking protection" (as required by Section 2262(a)(1)). The trial judge took the motion under advisement.

---

[4] The government also had to prove "that there was [an] articulated benefit, reward, or otherwise that motivated his kidnapping of Ms. Stefanov," but that isn't at issue before us.

Near the trial's end, the parties debated jury instructions. With respect to the Section 2262(a)(1) violation, the government asked the court to modify its proposed instruction to say that, as a matter of law, the No Contact Order qualified as a protection order. Pilson objected, arguing that the question of whether a victim is seeking protection is a factual inquiry that had to be determined by a jury. The court ultimately agreed with the government and granted the request for the proposed instruction, finding support in the language of the statute, precedent, and the undisputed facts in evidence.

After Pilson rested his case and the court read the jury instructions, Pilson renewed his motion for acquittal on the same grounds as before. In due course, the jury returned a guilty verdict on both counts. The court later issued a written denial of Pilson's acquittal motion.

At Pilson's sentencing hearing, he objected to an obstruction of justice enhancement that probation recommended based on his telephone calls to Stefanov during his pretrial incarceration (the substance of which was evidenced by a transcript). Overruling the objection, the court found the enhancement rightfully applied because the substance of the conversation evinced that Pilson sought to influence Stefanov by urging her to recant her accusations against him -- as the court put it, "in other words, to lie" -- and Pilson "threatened that he

might kill himself if she didn't."  And the court noted, in response to Pilson's effort to obstruct justice, Stefanov had in fact sent a letter to the prosecutor explaining that the kidnapping charges against Pilson should be dropped, falsely asserting the situation was nothing more than an "interpersonal affair."

After all formal matters had been addressed, Pilson exercised his elocution rights and thereafter, the court handed down 156-months' imprisonment for Count I and a concurrent sentence of fifty-months' imprisonment for Count II.  This appeal followed, and here we are.

### III. Discussion

Before us, Pilson reprises substantially the same arguments he presented below, and we'll resolve them in the same order we've introduced them above.

### a. Sufficiency of the Evidence

Pilson asserts that the government's evidence was insufficient for a jury to conclude the voluntary car ride became a kidnapping before or while he and Stefanov traveled from Massachusetts into New Hampshire or Maine and therefore, the district court should have granted his motion for acquittal.  See Fed. R. Crim. P. 29(c).  Read on to understand why we disagree.

The essence of Pilson's position is this:  to be guilty of interstate kidnapping under Section 1201(a)(1) there must necessarily be a nexus between the seizure of an individual and

interstate travel (which we'll explain below). Such a nexus did not exist here, he says, because Stefanov's withdrawal of consent -- and both Pilson and the government do agree the ride began with her consent -- did not occur until the two had already crossed the state line into Maine. Because Pilson preserved his challenge to the sufficiency of the evidence, our review is de novo. See United States v. Maldonado-Peña, 4 F.4th 1, 50 (1st Cir. 2021).

We examine the record in the light most favorable to the verdict. United States v. Clough, 978 F.3d 810, 816 (1st Cir. 2020). Reversal on a sufficiency challenge is permissible only when, "after viewing the evidence and reasonable inferences in the light most flattering to the prosecution, we conclude that no rational jury could have found [the defendant] guilty beyond a reasonable doubt." United States v. Seary-Colón, 997 F.3d 1, 12 (1st Cir. 2021) (citation modified). Our review does not require us to "view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls." Id. Instead, we give the government "the benefit of all sensible inferences and credibility choices." United States v. Cruz-Ramos, 987 F.3d 27, 36 (1st Cir. 2021). Pilson cannot be successful by merely demonstrating that there exists a plausible interpretation of the evidence supporting a "not guilty" verdict. See Seary-Colón, 997 F.3d at 11-12. Moreover, the government is not required

to dispel "every possible theory consistent with the defendant's innocence" before the jury. Id. at 14 (citation omitted). And in making our assessment, we do not step into the shoes of the jury to "decide which witness to credit, for we must assume that the jury credited those witnesses whose testimony lent support to the verdict." United States v. Soler-Montalvo, 44 F.4th 1, 8 (1st Cir. 2022) (citation modified). In the event our record review causes us to conclude reversal is proper, acquittal will ensue and preclude a second trial. See Maldonado-Peña, 4 F.4th at 50.

To be successful in its kidnapping prosecution, the government had to prove, beyond a reasonable doubt, that Pilson: (1) knowingly and willfully, (2) seized, abducted, or confined Stefanov, (3) transported Stefanov in interstate commerce, and (4) held Stefanov for ransom, reward, or otherwise. See 18 U.S.C. § 1201(a). Because the challenges here concern only the second and third elements -- seizure and transport across state lines -- we'll limit our discussion to the evidence relevant to those two elements. As such, the crucial question we ask is whether the evidence could allow a reasonable jury to conclude Pilson and Stefanov's journey took a turn for the worse (literally and figuratively) before or during their travel across state lines, both of which could sustain his conviction for the Section 1201(a) offense.

- 12 -

First, though, given Pilson's arguments on appeal, it will be helpful to say a bit more about those two elements of the offense.

### i. The basics of seizure and consent

The Supreme Court has long made clear that "the involuntariness of seizure and detention . . . is the very essence of the crime of kidnapping." Chatwin v. United States, 326 U.S. 455, 464 (1946). As such, the seizure element of Section 1201(a)(1) is not met when the alleged victim is actually a consenting participant in accompanying a purported kidnapper. See United States v. Lowe, 145 F.3d 45, 52 (1st Cir. 1998) ("Consent is a defense to kidnapping . . . ."); see also United States v. Coleman, 149 F.4th 1, 50 (1st Cir. 2025) (stating that it would be "appropriate to include an explicit instruction [for the jury] regarding consent in describing both the seizure and holding elements" in Section 1201(a)(1)); United States v. Toledo, 985 F.2d 1462, 1468 (10th Cir. 1993) (explaining that a victim's consent to accompany the defendant in interstate travel is a defense to Section 1201(a)(1)).

But there are temporal and geographic aspects of an alleged victim's voluntariness that remain important in determining whether they were kidnapped for the purposes of Section 1201(a)(1).

A kidnapping victim is not prohibited from giving their consent to a kidnapper after the incident has begun (thereby ending the kidnapping) but before crossing state lines. Those two elements of Section 1201(a) (seizure and transport across state lines) must coincide with one another for a defendant's actions to fall within the scope of the offense. United States v. Krivoi, 80 F.4th 142, 149 (2d Cir. 2023) ("[T]here must be an interstate or foreign commerce nexus[.]"); Toledo, 985 F.2d at 1467 ("If the victim is no longer being held against her will, the kidnapping has ended, and the interstate travel cannot serve to further the commission of the crime."); United States v. Hernandez-Montoya, 39 F. App'x 38, 39 (4th Cir. 2002) ("The interstate travel requirement merely necessitates that the victim was held against her will while crossing state lines."); United States v. Wright, 340 F.3d 724, 731 (8th Cir. 2003) ("[T]he individual charged [with violating Section 1201(a)] may raise a valid defense that the victim consented to accompany him in interstate travel.").

Contrariwise, a kidnapping victim is not prohibited from withdrawing their consent to travel with a person after embarking on the journey, and such a withdrawal can be sufficient to satisfy the seizure element of Section 1201(a)(1). If consent is withdrawn prior to crossing state lines, and they do, in fact, cross state lines, the interstate travel element is met. As our sister circuit explained, "[t]he fact that one originally accompanies another

without being forced does not prevent the occurrence of a kidnapping where force is later used to seize or confine the victim."  United States v. Redmond, 803 F.2d 438, 439 (9th Cir. 1986).  Put simply, a traveler's consent is not set in stone; rather, they reserve autonomy to decide they want out.  And the travel companion must accept that traveler's withdrawal of consent or potentially face the consequences for violating Section 1201(a)(1).

With these basics in mind, we move on to discuss the merits of Pilson's challenges.

### ii. Viewing the record

Pilson does not seriously contest that at some point after Stefanov voluntarily entered her own vehicle with Pilson sitting in the driver's seat, he held her against her will. Rather, his allegation of reversible error is premised on the notion that Stefanov was never specifically asked during any of her testimony to provide the exact point at which she became a non-consenting victim.  In Pilson's view of the evidence, it was only when Stefanov testified that "Pilson backhanded her and attempted . . . to tie her wrist to the car's gear shift" did she become a person held against her will, and that turning point didn't occur until the two were already "deep into Maine . . . [,] at or very near the end of the trip" -- which concluded in Arundel, a town located "roughly 30 miles into Maine."

Not so, says the government, and we need look no further than its Exhibit 305, Stefanov's Witness Statement, to find proof of Stefanov's involuntary seizure and transportation across state lines.[5]  We agree.  At trial, this Witness Statement -- that

[5] On this piece of evidence, Pilson makes two arguments as to why we should disregard it in our review of the record.  We disagree on both fronts.  First, Pilson stated in his supplemental brief that the government is now relying on Exhibit 305 to present what he deems a novel theory of the case.  His position is fallacious.  Contrary to his belief, the government's reliance on Exhibit 305 to prove the kidnapping began before Pilson and Stefanov crossed state lines is not a novel theory of the case; it is *the* theory the government presented at trial.  See United States v. Matta-Quiñones, 140 F.4th 1, 12 (1st Cir. 2025) ("[W]e treat arguments as preserved only if litigants 'said enough to alert the [district] court to the theory now being propounded' on appeal.").  Pertinent to this conclusion is the government's summary of the case in its closing argument, which began with the following direct quotes from Exhibit 305: "We are going to go for the ride of your life, which is going to end tonight, your life and mine.  The defendant [(Pilson)] said these words to Rilka Stefanov as they drove up the interstate from Massachusetts, through New Hampshire, into Maine."  This narrative is consistent with the theory of the case presented by the government.

Second, Pilson contends that although the government leaned heavily on Exhibit 305 during oral argument to show it introduced sufficient evidence at trial of the transportation-across-state-lines element, it didn't rely on Exhibit 305 in its opening briefing to us to argue the same.  But Pilson cites to no case law, and we are aware of none, suggesting a prosecutor is obligated to harp on every single piece of properly admitted trial evidence in its briefing to support its arguments.  The trial court admitted Exhibit 305 in full, the jury was allowed to consider it in reaching its verdict, and that evidence is present in the trial record for our review and evaluation.  Additionally, Pilson can hardly claim surprise and prejudice here.  There are multiple portions of the government's brief to this court that draw attention to the statements inscribed in Exhibit 305, so that even if Pilson's waiver argument had some bite (which it doesn't), the government's effort here is sufficient to preserve the issue for our consideration.  See, e.g., United States v. Ilarraza, 963 F.3d 1, 16 (1st Cir. 2020) (stating that "a party

Stefanov completed in her own handwriting on December 15, 2019, the day of the incident, and signed under pains and penalty of criminal prosecution -- was admitted without objection as a full exhibit. In her statement, Stefanov said (as we previously highlighted) that after Pilson "started driving my car" away from Beverly Beach in Massachusetts where they had been parked, he said "we're going for a ride to Canada." He then began "drinking from a large bottle" and said (to Stefanov), "we are gonna go for the ride of your life which is gonna end tonight, your life and my life." She explained that Pilson, who "[spoke] in [a] pressured way and . . . was like in some kind of his own world or tran[ce]," said (after making his initial threat) "people like [her] need to die," and he "sped up to like 110 miles per hour while driving to New Hampshire and then Maine." While Stefanov's Statement doesn't pin down the exact moment Pilson communicated his threats to her, a reasonable jury could easily and fairly infer from her chronological recounting of what happened that day that Stefanov transitioned from being a willing passenger in Massachusetts to an unwilling captive, and did so during or prior to when they crossed one, if not two, state lines into Maine.

---

must do more than merely 'mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))).

- 17 -

If that were not enough (though it is), Stefanov's testimony during the government's direct examination further corroborates her Exhibit 305 statement and provides more support for the jury's conclusion. For instance, Stefanov explained that during her ordeal, Pilson was driving erratically, and that is when she started trying to open the door to "signal people that [were] driving around [them]." Pilson had then "knocked the phone out of [her] hand," "tied [her] hands [with her scarf] while [(simultaneously)] driving," and "hit [her] several times in the face." When questioned about the number of times she tried to signal other motorists, Stefanov specifically stated that she attempted to open the door to signal other drivers "[s]everal times" throughout their travel from Massachusetts to Maine. This testimony, in conjunction with Exhibit 305, would allow a reasonable jury to infer that the kidnapping began prior to the two crossing into Maine.

Resisting this conclusion, Pilson points to several pieces of evidence he contends are vague at best or uncredible at worst, which he says the government leans on heavily to prove the kidnapping satisfied the interstate travel element. Though we have considered all of Pilson's references to so-called problematic evidence, we will provide a couple of examples representative of the batch to explain why this argument falls flat.

Pilson says the government's arguments place improper reliance on emergency (9-1-1) calls by concerned citizens in Maine, which he says provide no support for a finding that the kidnapping began before the two entered Maine. Pilson makes a similar attack on portions of Stefanov's testimony wherein she explained that Pilson told her she didn't need a seatbelt because she would die that day and that he was going to take her to Canada where she'd be buried. He contends that, like the 9-1-1 calls, Stefanov's testimony does not prove that the kidnapping began before the two crossed into Maine.

The problem with Pilson's argument is that even if his view of these particular facts could be deemed plausible, he is singling out individual pieces of evidence while ignoring the entirety of the government's evidentiary narrative as we've already described it. And our role here is to "determine whether th[e] sum [of evidence] is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not enough when viewed in isolation." Seary-Colón, 997 F.3d at 12 (citation modified). Pilson therefore fails in his attempt to limit the government's position to individual pieces of evidence. See, e.g., United States v. Shaw, 670 F.3d 360, 362 (1st Cir. 2012) ("Individual pieces of evidence viewed in isolation may be

- 19 -

insufficient in themselves to prove a point, but in cumulation may indeed meet the mark.").

Additionally, Pilson's multiple attempts to challenge the jury's ability to credit Stefanov's testimony as supportive of a conclusion that the government met its interstate travel evidentiary burden, solely because he finds it to be inconsistent with some pieces of the evidentiary record, gets him nowhere.[6]  To reiterate, we are not here to "decide which witness to credit," Soler-Montalvo, 44 F.4th at 8, or to "second-guess the jury's credibility calls," United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013).  Moreover, the existence of conflicting pieces of evidence or testimonies by different witnesses does not require the jury to conclude in favor of the defendant.  See United States

---

[6] Describing what he views as inconsistent evidence, Pilson asserts in his brief that Stefanov testified that he tied her wrists while driving at a high-speed, but she previously stated to the police that Pilson attempted to tie her wrist after pulling over in Maine.  Pilson similarly points out that Stefanov testified that she broke the key off in the ignition while Pilson was driving and that is what forced him to pull over, but she stated to police that she didn't break the key off until after Pilson pulled the vehicle over.  He then draws attention to Stefanov's testimony that "Pilson backhanded her and attempted -- deep into Maine -- to tie her wrist to the car's gear shift."  He asserts that these events occurred "at or very near the end of the trip, which concluded roughly 30 miles into Maine."  Pilson argues that because the incident concluded in Maine, and that Stefanov gave conflicting explanations of when the bondage attempt occurred, the jury could not reasonably rely on her statements to conclude the kidnapping began before crossing into Maine.  As we are about to explain above the line, it is the jury that is tasked with resolving potential evidentiary conflicts.  See United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013).

v. Meises, 645 F.3d 5, 12 (1st Cir. 2011) ("The jury assesses witness credibility." (quoting United States v. Rivera-Rodríguez, 617 F.3d 581, 596 n.6 (1st Cir. 2010))).  The same rule applies when a jury hears one witness's statements that may be in contradiction to what they previously said but renders a verdict in favor of that witness's in-court narrative.[7]  Id.  The jury is charged with determining which narrative to believe, and our only job is to assure that there was adequate record support for its findings.  Because here, we conclude that the evidence satisfactorily gets the job done, we will not override the jury's determination that Stefanov retracted her consent prior to crossing into New Hampshire or Maine, thereby establishing the nexus between the kidnapping and travel across state lines.  Pilson's conviction for the Section 1201(a)(1) offense stands.

### b. Jury Instruction

Persistent in his efforts to overturn his conviction, Pilson also takes issue with the district court's jury instruction

---

[7] It is worth mentioning, even though the jury is charged with weighing the evidence, Soler-Montalvo, 44 F.4th at 8, nothing in the record demonstrates Stefanov ever presented a different narrative of the incident for the jury to rely upon.  Despite any purported inconsistencies, even when being cross-examined about her statements in Exhibit 305, Stefanov held the line by confirming that she wrote the statements "immediately after" the incident and found them to be "most true."  Her testimony and Exhibit 305 match the narrative that the government presented at trial -- Pilson made the threatening statements and initiated the kidnapping before the two crossed into New Hampshire or Maine.

for the Section 2262 offense -- the statute criminalizing interstate violations of protection orders. See 18 U.S.C. § 2262(a)(1). Again, we are unconvinced.

But before we explore Pilson's challenge, allow us to explain some ground rules that will guide us in our analysis.

We analyze preserved challenges to jury instructions under a bifurcated framework. United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). Challenges to whether an instruction is an accurate representation of the applicable law are reviewed de novo; challenges to the specific language the court uses in an instruction (that confuses or misleads the jury) are reviewed for abuse of discretion. See id. Pilson's challenges concern the statutory definition of the term "protection order" in 18 U.S.C. § 2266(5)(A) ("Section 2266") and thereby fall in the former category (those subject to de novo review).

Section 2262(a)(1) was established by the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, § 40001, 108 Stat. 1796, 1902 (1994), and it criminalizes the conduct of one who travels

> in interstate or foreign commerce . . . with the intent to engage in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person . . . and subsequently engages in such conduct.

18 U.S.C. § 2262(a)(1). The term "protection order" is defined in Section 2266(5)(A) (the definitions provision of VAWA) to include

> any other order issued by a civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence, or contact or communication with or physical proximity to, another person, including any temporary or final order issued by a civil or criminal court . . . so long as any civil or criminal order was issued in response to a complaint, petition, or motion filed by or on behalf of a person seeking protection[.]

18 U.S.C. § 2266(5)(A). We've previously explained that Congress intended this portion of the definition to be a "catch-all" phrase for "a wide swath of court orders that are not specifically delineated" in the statute. United States v. Dion, 37 F.4th 31, 35 (1st Cir. 2022); see also id. ("reasoning that [a] statutory phrase including [the] term 'any' 'suggests a broad interpretation'" (citation modified)). Though we find its meaning expansive, we did not render a free-reign interpretation of the phrase. There are, as we explained, two key requirements. A "protection order" must first be issued for a reason consistent with those listed in Section 2266(5)(A); and, second, "'any other order issued by a civil or criminal court' may be a 'protection order' . . . 'so long as' it is 'issued in response to a complaint, petition, or motion filed by or on behalf of a person seeking protection.'" Id. at 36 (quoting 18 U.S.C. § 2266(5)(A)). We base these two requirements on the plain and unambiguous language

in Section 2266(5)(A) set forth by Congress in promulgating VAWA. Id.; see also Littlefield v. Mashpee Wampanoag Indian Tribe, 951 F.3d 30, 37 (1st Cir. 2020) ("If [the statutory text is plain and unambiguous], we must apply the statute according to its terms." (quoting Carcieri v. Salazar, 555 U.S. 379, 387 (2009))).

In his opening brief, Pilson asserts that the district court fumbled by instructing the jury that the No Contact Order entered by the Massachusetts court fits within the definition of a "protection order" provided in Section 2266(5)(A).[8] The aggrieved Pilson claims the No Contact Order fails to meet the statutory definition as it was not, according to him, "issued in response to a complaint, petition, or motion filed . . . on behalf of a person seeking protection." 18 U.S.C. § 2266(5)(A). His attack is double-barreled. First, finding support in Stefanov's testimonial opposition to the Commonwealth's oral motion for the No Contact Order, Pilson argues that because Stefanov (the victim of the underlying offense) herself rejected the Order, she could not plausibly be characterized as "a person seeking protection" in accordance with Section 2266(5)(A). He points to portions of Stefanov's testimony where she stated, "I do feel safe, and I do feel that . . . having . . . interaction, it will be good for him,

---

[8] In providing instructions to the jury, the district court stated: "I instruct you that the stay-away, no contact condition in Government's Exhibit 101 is a protection order as a matter of law."

- 24 -

but also it will be good for me."  With the same factual support, Pilson's second contention is that the Massachusetts court couldn't have entered the No Contact Order on Stefanov's behalf as it went against her express wishes.

The government's retort is that the No Contact Order met the dual criteria for Section 2266(5)(A) that we set forth in Dion, 37 F.4th at 36.  Specifically, it asserts, (1) that the Massachusetts court imposed the No Contact Order to prevent Pilson from contacting or interacting with Stefanov, and (2) the court did so in response to Stefanov's initial complaint seeking protection from law enforcement following the October 15 incident. As for Stefanov speaking against the No Contact Order at the Massachusetts court proceeding, the government first says her remarks should not be difference-makers as Stefanov was clearly under duress, and she made the reality of her duress quite clear when she testified against Pilson at his federal trial.[9]  Further,

---

[9]  The government points out that, during its direct examination of Stefanov at the trial below, it asked Stefanov if she spoke with Pilson during his pre-trial incarceration on the state charges, and she replied, "[y]es."  They spoke near daily -- and at her expense -- she said, and during some of those calls, Pilson told Stefanov "it was [her] fault" he was in jail, and he asked Stefanov to "help him get out."  And if she refused, he'd "[h]urt himself or kill himself."  So at his sentencing hearing, she spoke at his request and told the court what he said she "should say when [she] got there" -- that she felt safe with him.  The government then asked Stefanov whether she was being truthful when she "told the [c]ourt that [she] felt safe with Mr. Pilson[,]" and Stefanov replied, "[n]o."  When asked why she stated the opposite, Stefanov responded, "I don't know, I just felt guilty

- 25 -

the government argues Stefanov's statements (made under duress) do not negate the fact that the No Contact Order was made "in the interest of" or "for the benefit of" Stefanov -- as we understood those terms to mean in our previous construction of "on behalf of" in Section 2266(5)(A)'s clause. See id. at 40. Therefore, concludes the government, Stefanov "qualif[ies] as a 'person seeking protection' from precisely the type of abuse that" Section 2266(5)(A) was intended to protect.

Pushing back on the government's arguments, Pilson's reply brief reasserts, in core essence, that the No Contact Order here did not fall under the purview of Section 2266(5)(A) because the Commonwealth's motion for the No Contact Order was not made on Stefanov's behalf -- she opposed it, and she cannot be considered a person seeking protection because what she was actually seeking was continued contact with Pilson. And he says the government's argument that in the "broader 'backdrop,'" Stefanov was either secretly wanting the No Contact Order or, even if not, such an order was in her best interest and thus sought on her behalf, was "deeply flawed." So, argues Pilson, if the government is correct that the statute allows for disregarding a victim's express wishes,

---

because he would somewhat easily kind of go off on a -- become upset easily, his mood would change, and I think I often tended to blame myself for that," and "[b]ecause I think I was torn and I needed to -- I felt like I have to oblige and kind of help him in this situation."

or allows for a determination that the victim's need for protection can fall contrary to their stated will, such a determination, as well as a finding of duress, "must be made by the finder of fact, not decreed from the bench as a matter of law."

### i. Whether Stefanov was "a person seeking protection"

We begin with Pilson's attempt to cast Stefanov out of the meaning of "a person seeking protection" because, as he tells it, the request for a protective order was made against her express wishes. In Dion, we found the victim constituted "'a person seeking protection' from abuse of the kind with which . . . VAWA is concerned" based on her "complaining of [physical] abuse to the authorities . . . at the hands of her long-term boyfriend (the defendant)," thus initiating a criminal charge of aggravated assault. 37 F.4th at 38. The "No Contact Order" relevant to our inquiry there was a provision included in the defendant's conditional release order. Id. at 33. And regardless of the procedural process which led to the imposition of the No Contact Order, it was the victim's initial complaint -- not some additional information from the victim (who was not present) at the time of the bail hearing -- that served as the focal point for our determination of whether she should have been classified as "a person seeking protection," 18 U.S.C. § 2266(5)(A). See Dion, 37 F.4th at 38.

The same holds true here. Regarding the October 2019 kidnapping, Stefanov first sought protection from law enforcement the first time around, after she escaped the vehicle Pilson was driving (her vehicle) and called out for help and for someone to contact the police. When the police arrived, Stefanov was "visibly upset," as she explained to them the domestic abuse she'd just endured and her long-term dealings with Pilson. And she provided law enforcement with sufficient information to apprehend Pilson (who had driven off in Stefanov's vehicle after her escape). These events resulted in the Massachusetts criminal complaint against Pilson for kidnapping and other domestic abuse offenses wherein, at sentencing, the court imposed (among the other punishments we've listed above), the No Contact Order. Consistent with our reasoning in Dion, which focused on the victim's initial complaint to police, Stefanov was necessarily "a person seeking protection" here at the time the Commonwealth initiated the complaint against Pilson. Accordingly, the No Contact Order satisfied the first requirement of Section 2266(5)(A).

### ii. Whether the No Contact Order was filed "on behalf of" Stefanov

Next is Pilson's assertion that the No Contact Order was not filed "on behalf of" Stefanov because she opposed the Order. We cannot agree.

- 28 -

The government presses (and we agree) that our Dion decision remains the primary authority for this issue. There, we found Congress intended the meaning of the "on behalf of" clause to be expansive. See 37 F.4th at 41-42. The inclusion of "criminal orders" in Section 2266(5)(A) indicated the "on behalf of" clause has a meaning akin to "in the interest of" or "for the benefit of[,]" based on the distinction between "civil protection orders" that are "sought by a petitioner either by bringing an independent civil action or by motion in an ongoing civil case" and "criminal protection orders" that "are often issued as bail conditions or as conditions of release to protect the victim during the pendency of a criminal case." Id. at 40 (citation modified) (quoting Off. on Violence Against Women, U.S. Dep't of Just., 2018 Biennial Report to Congress on the Effectiveness of Grant Programs Under the Violence Against Women Act (hereinafter "VAWA Report") 148 (2018), https://www.justice.gov/ovw/page/file/1292636/dl [ht tps://perma.cc/R88U-L965])). Resultingly, we rejected a narrow interpretation of the clause that would align with agency principles (as in a party acting as a representative of a client) and instead favored a broader meaning of "on behalf of" that captures criminal orders "issued either at a prosecutor's behest or sua sponte by the court (*and not at the request of a victim*)" (as in simply the interest of or for the benefit of one seeking protection). Id. at 41 (emphasis added). An opposite conclusion,

we said, would "be unreasonable as it would nullify Congress's apparent intent to include 'criminal order[s]'" in the definition's sweep. Id.

Similar to Dion, the prosecutor in Pilson's case moved the court to impose the No Contact Order as part of his sentence due to the history of domestic disputes between him and Stefanov. Thus, the Commonwealth undoubtedly made its motion "in the interest of" or "for the benefit of" Stefanov -- to protect a victim that suffered from repeated instances of domestic abuse. See VAWA Report, at 7 (stating that domestic abuse "rarely occur[s] as one-time incidents, but rather comprise behaviors that tend to be ongoing, repetitive, and patterned, and leave their victims vulnerable to further harm"). When considering the Commonwealth's request for the No Contact Order, the court -- after hearing from Stefanov herself, Pilson's counsel, and the Commonwealth's attorney, and after giving Pilson an opportunity to be heard on the issue -- concluded the Order would benefit Stefanov. The court explained that it had "concerns that [Stefanov] really could have been killed that day[,]" and that "[i]t doesn't sound like [Pilson and Stefanov] being together is a good thing."

Relying on our interpretation in Dion, we read the "on behalf of" clause to include this Order in its scope. That is, a criminal No Contact Order that, even after considering Stefanov's (the victim) stance, the court issued as part of Pilson's sentence

- 30 -

to prevent him from subjecting Stefanov to future instances of domestic abuse. See Dion, 37 F.4th at 40; Model Code on Domestic and Family Violence § 208 (Nat'l Council of Juv. & Fam. Ct. Judges 1994) ("[T]he court or agency having authority to make a decision . . . may impose conditions of release or bail on the person *to protect the alleged victim*," including no-contact and stay-away orders. (citation modified)).

Were we to interpret Dion as Pilson suggests -- to mean a victim's subjective benefit determines whether a protection order was made on their behalf -- we would cut against "Congress's intent to afford the 'protection order' definition expansive scope[,]" and "leave unpunished (under the VAWA) violators of criminal orders sought by prosecutors to protect victims of abuse . . . [,] simply because the victim or her legal representative may not specifically have requested [or concurred with] such [an] order[]." Id. at 41-42 (quotation modified); see also id. at 42 (reasoning that "Congress's changes to the 'protection order' definition" have "served only to expand its breadth"); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 106, 119 Stat. 2960, 2982 (2006) (adding the terms "restraining order" and the word "any" before "other order")). Accordingly, we refuse to now interpret the statute in a way that would undermine the Commonwealth's decision to move for a protective order on behalf

- 31 -

of a victim of domestic abuse that the prosecutor deems necessary to protect said victim. And we equally refuse to interpret it in a way that would undermine a trial judge's reasonable assessment of facts or legal determination that a No Contact Order is necessary to protect a domestic abuse victim. See, e.g., Acosta-Colon, 741 F.3d at 200 ("[D]etermining credibility, weighing the evidence, and drawing inferences from the evidence all f[e]ll within [the trial judge's] province[.]).

Bolstering our interpretive view of the "on behalf of" clause is the prevalent issue, as acknowledged by the Supreme Court, of repeated domestic abuse offenses deriving from victims being intimidated or coerced to not testify against, or speak in favor of, their abuser. See, e.g., Kathleen Waits, The Criminal Justice System's Response to Battering: Understanding the Problem, Forging the Solutions, 60 Wash. L. Rev. 267, 281-84 (1985) (explaining the "battering cycle" and the psychological effects of victims facing domestic abuse); see Davis v. Washington, 547 U.S. 813, 833 (2006) (stating that domestic abuse victims are "notoriously susceptible to intimidation or coercion"); VAWA Report, at 26 (explaining that "[v]ictim intimidation or tampering with victim-witnesses are often significant reasons for victim reluctance to cooperate in prosecution"). Considering this common understanding of domestic abuse cycles, we find that Congress was undoubtedly aware of such testimonial risks and took into

consideration the psychological aspects of domestic abuse when it provided VAWA's legal definition of "protection order" -- "the federal response to the issue of domestic violence" -- using broad, inclusive language. Dion, 37 F.4th at 40; cf. Voisine v. United States, 579 U.S. 686, 699 (2016) (using state-law background to infer Congress intended the scope of a federal ban on firearm ownership to encompass individuals with prior misdemeanor convictions for reckless use of force against a domestic relation). Thus, we reasonably conclude that our understanding of the "on behalf of" clause includes No Contact Orders that may be inconsistent with a domestic abuse victim's testimony.

All in all, we find no error in the district court's instruction that the No Contact Order met the definition of "protection order" in Section 2266(5)(A). In the same vein as Dion, we conclude the No Contact Order imposed as part of Pilson's sentence satisfactorily "constitute[d] a protection order" as it was "issued in response to a complaint, petition, or motion filed . . . on behalf of [Stefanov]," who qualified as "a person seeking protection." 37 F.4th at 43 (quoting 18 U.S.C. § 2262(5)(A)). Section 2262(5)(A) "does not require that the person seeking protection" do so "directly in the form of a court order." Id. Rather, as was the case here, "a person need only be found to be seeking protection," and the resulting No Contact Order "sought by a prosecutor on [the person's] behalf [that] . . . aids

- 33 -

[their] protection" falls within the statutory scope. <u>Id.</u> Accordingly, we will not disturb Pilson's conviction for the Section 2262(a)(1) offense.

### c. Obstruction of Justice Enhancement

We briefly discuss Pilson's last challenge, which argues that the district court's application of a sentencing enhancement for obstruction of justice under U.S.S.G. § 3C1.1 ("Section 3C1.1") -- due to his pre-trial incarceration phone calls to Stefanov -- was error.[10] We review preserved claims of procedural sentencing errors for abuse of discretion. <u>United States</u> v. <u>González-Santillan</u>, 107 F.4th 12, 17 (1st Cir. 2024). "Within this framework, we review a district court's factual findings for clear error, and its interpretation and application of the Guidelines de novo." <u>Id.</u> (quoting <u>United States</u> v. <u>Vélez-Soto</u>, 804 F.3d 75, 77 (1st Cir. 2015)).

We can set aside the specifics of Pilson's obstruction enhancement challenge for a rather simple reason: in sentencing

---

[10] The two-level enhancement is applicable where:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense[.]

U.S.S.G. § 3C1.1.

Pilson, the district court stated that it had "carefully considered each of" his objections "as it might impact the determination of the sentencing guidelines," and that "the sentence . . . [was] untethered from the guidelines."  Meaning, the court said, it "would [have] impose[d] the same exact sentence even if the applicable sentencing guideline[s] range would have been reduced by one or more of the . . . arguments . . . ."

We've held on several occasions that such situations, without more, result only in harmless error that we will not overturn on appeal.  See United States v. Ortiz-Álvarez, 921 F.3d 313, 319 (1st Cir. 2019)(explaining that the district court "'intended to untether' its sentence from the guidelines calculations presented to him (and any errors in them)"); United States v. Fernández-Garay, 788 F.3d 1, 5 (1st Cir. 2015)("[A]n error is deemed harmless if a reviewing court can say with fair assurance that the sentencing court 'would have imposed the same sentence even without the error.'" (quoting United States v. Tavares, 705 F.3d 4, 25 (1st Cir. 2013))); United States v. Acevedo-Hernández, 898 F.3d 150, 172 (1st Cir. 2018) ("In light of this clear indication in the record that the court would have imposed the same sentence even without any of the alleged errors, we find that any errors in calculating Acevedo's [guidelines range] would have been harmless.").  Due to the district court's explanation that it provided at Pilson's sentencing, the result

here tracks with the relevant line of cases.  Accordingly, we find there is no reversible error regarding the district court's application of the obstruction enhancement.

## Conclusion

Consistent with our discussion, we **affirm** Pilson's conviction and sentence in their entirety.